**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| **Faxon Sales, Inc.**, a Connecticut corporation, | Civil Action No. 17-872 |
| Plaintiff, | **COMPLAINT** |
| v. | *[Jury Trial Demanded]* |
| **U-Line Corporation**, a Wisconsin corporation, | |
| Defendant. | |

Plaintiff Faxon Sales, Inc., ("Faxon"), for its Complaint against U-Line Corporation ("U-Line"), states and alleges as follows:

## I. INTRODUCTION

1.      U-Line unceremoniously and without cause ended its 42-year distributorship relationship for U-Line products with Faxon and its predecessor in violation of several applicable statutes, including, most notably, the Connecticut Franchise Act, simply because U-Line wanted to reduce its distribution network.

2.      U-Line's without cause termination of the Distributorship Agreement with Faxon unlawfully stripped Faxon of nearly 40% of its revenue and also has so reduced Faxon's profits that Faxon has had to lay off employees, reduce salaries, and completely alter its going-forward business plan.

3.      Faxon, which since 1974 had been an exemplary distributor of U-Line's unique and in demand under-the-counter refrigeration and ice-making machines in an exclusive territory that comprised of the states of Maine, New Hampshire, Vermont, Massachusetts, Connecticut,

and Rhode Island, and 52 counties in New York (the "Distributor's Area"), cannot replace this product line and, as such, has lost approximately $3 million in annual revenue, and $600,000 in gross annual profits.

4.      U-Line's without-cause termination is a violation of the Connecticut Franchise Act ("CFA"), the Connecticut Unfair Trade Practices Act ("CUTPA"), the Rhode Island Fair Dealership Act ("RIFDA"), the New York Unfair Trade Practices Act ("NYUTPA"), the Massachusetts Consumer Protection Act ("MCPA"), and the New Hampshire Consumer Protection Act ("NHCPA").

5.      U-Line's unlawful termination of the Distributor Agreement entitles Faxon to recover its actual damages, which are the profits it has lost and will lose  in the future from no longer being able to be a distributor of this line of products, as well as the costs of pursing this action, including its reasonable attorneys' fees.

## II.  PARTIES

6.      Plaintiff Faxon Sales, Inc. is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 90 Progress Drive, Manchester, Connecticut 06042.

7.      Defendant U-Line Corporation is a corporation organized under the laws of the State of Wisconsin, with its principal place of business at 8900 N. 55th Street, Milwaukee, Wisconsin 53223-2314.

## III.  JURISDICTION

8.      Diversity jurisdiction exists over this case pursuant to 28 U.S.C. § 1332.  Faxon is a Connecticut corporation with its principal place of business in the State of Connecticut, while U-Line is a Wisconsin corporation with its principal place of business in State of Wisconsin.

Further, the amount in controversy is reasonably believed to exceed $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over U-Line because its principal place of business is in Milwaukee, Wisconsin, and because many of the actions that make up the basis of this dispute occurred in Milwaukee, Wisconsin.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a), because many of the actions that make up the basis of this dispute occurred in Milwaukee, Wisconsin, and because the Distributor Agreement expressly states that the venue for any disputes regarding the Distributor Agreement shall be in the United States District Court for the Eastern District, State of Wisconsin.

## IV.  BACKGROUND FACTS

### *U-Line has a long history of innovation.*

11.     In 1962, Henry Uihlein left his position at the Ben Hur Freezer Company to begin manufacturing his own invention, which was the first under-the-counter residential and light commercial ice maker, for his new company, U-Line.

12.     For the next 50-plus years, U-Line developed into one of the leaders and innovators in under-the-counter refrigerators, ice makers and wine refrigeration units.

13.     In 1971 U-Line introduced the first under-the-counter Combo Model® icemaker and refrigerator.  The unit was able to maintain two temperature zones in the same cabinet using a single compressor.  U-Line also introduced the first portable icemakers, designed with a built-in water tank that allowed owners to move the unit anywhere in the house.

14.     In 1985 U-Line became the first U.S. manufacturer to produce an under-the-counter wine refrigerator for residential wine storage.  U-Line named this unit the

3

Wine Captain®, which featured three temperature zones within the same cabinet to offer proper storage conditions for different varieties of wine.

15.     In 1987 U-Line developed and patented the industry's first solid-state icemaker, which had display lights and sound tones that would alert the user when defrosting and other maintenance functions were required.

16.     In 1989 U-Line continued its theme of improvement and modernization by redesigning its entire product line with an international look.  The new designs were conscious of esthetic value, yet still featured the latest technology, making the products more contemporary and desirable for residential use.

17.     In 1993 U-Line became the first North American appliance manufacturer to eliminate chlorofluorocarbons ("CFCs") from its foam insulation, which was more than two years ahead of the scheduled federal government mandate.

18.     In 1998 U-Line designed and developed the CLR60 clear ice machine, which was then the most innovative and technologically-advanced residential and light commercial ice machine on the market, capable of producing more than 60 pounds of clear ice cubes per day.

19.     In 2001 U-Line redefined the built-in under-the-counter refrigeration market with its introduction of the Échelon Series, a diverse collection of luxury icemakers.

20.     In 2003 U-Line premiered its Échelon refrigerator drawer, taking life, home and style to a new level of organization.  The company also brought to market the luxury of clear ice in refrigeration behind one door with the addition of the Échelon Clear Combo® model.

21.     In 2004 U-Line added its Combo® drawer icemaker/refrigerator/freezer and exclusive Wine Captain® drawer wine storage unit to the Échelon line and introduced the Origins Beverage Center.

4

22.     In 2006 U-Line introduced new design and performance innovations that featured refined styling and advanced digital technology to offer the most distinctive under-the-counter products available in both the Échelon and Origins series.

23.     In 2008 U-Line introduced the new dual zone Wine Captain® to provide two distinct temperature zones, each cooled and controlled independently.

24.     In 2009 U-Line achieved the highest energy efficiency rating available.  In addition to qualifying as an Energy STAR, U-Line received a Tier 3 rating from the Consortium for Energy Efficiency ("CEE") for two of its refrigerator models, the 2175R and the 1175R. The Tier 3 rating was the highest energy efficiency rating available.

25.     In short, U-Line had become the award-winning market leader in premium built-in under-the-counter ice making, refrigeration and wine preservation products, including a collection of modular under-the-counter refrigeration units that offered advanced technology, aesthetic elegance, and seamless integration for use in modern kitchens and lifestyles.

26.     Three generations of the Uihlein family continued to own U-Line until 2004, when Linsalata Capital Partners bought the majority of U-Line's stock. U-Line sought capitalization to further expand its product development.

27.     In October 2014, Middleby Corporation ("Middleby") acquired all of U-Line's stock from Linsalata and the Uihlein family.

28.     Middleby is a global leader in the foodservice equipment industry. The company develops, manufactures, markets and services a broad line of equipment used in the commercial foodservice, food processing, and residential kitchen equipment industries.

29.     Middleby's leading equipment brands serving the commercial foodservice industry include Anets®, Beech®, Blodgett®, Blodgett Combi®, Blodgett Range®,

Bloomfield®, Britannia®, Carter-Hoffmann®, Celfrost®, Concordia®, CookTek®, CTX®, Doyon®, frifri®, Giga®, Holman®, Houno®, IMC®, Jade®, Lang®, Lincat®, MagiKitch'n®, Market Forge®,Middleby Marshall®, MPC©, Nieco®, Nu-Vu®, PerfectFry®, Pitco Frialator®, Southbend®, Star®, Toastmaster®, TurboChef®, Viking®, Wells® and Wunder-Bar®.

30.     Middleby's leading equipment brands serving the food processing industry include Alkar®, Armor Inox®, Auto-Bake®, Baker Thermal Solutions®, Cozzini®, Danfotech®, Drake®, Maurer-Atmos®, MP Equipment®, Processing Equipment Solutions®, RapidPak®, Spooner Vicars® and Stewart Systems®.

31.     Middleby's leading equipment brands serving the residential kitchen industry include Brigade®, Jade®, TurboChef®, Viking®, and U-Line®.

32.     At the time of Middleby's acquisition of U-Line, Timothy Fitzgerald, vice president and CFO of Middleby, stated: "We are pleased to add U-Line to our portfolio of highly respected companies. U-Line is a well-established brand and a clear category leader in their segment. We look forward to supporting U-Line's continued growth and profitability throughout the residential market in North America and globally. It is our intent to help [U-Line President] Jennifer [Uihlein] and her executive team to continue to grow U-Line in Milwaukee, where it's been since the Uihlein family started the company in 1962."

33.     Unfortunately for Faxon and other long-time distributors U-Line products, one of Middleby's first orders of business upon taking over U-Line was to consolidate U-Line's distributor base by terminating without cause many of U-Line's long-time distributors, including Faxon.

6

### C. Ethan O'Brien forms Faxon

34.     Clarence Ethan O'Brien ("Ethan O'Brien") started a wholesale major appliances distribution business in April 1972 named Appliance Distributors of Ct., Inc. ("ADC"). ADC represented a number of major appliance brands, including Jenn-Air, which then was ADC's largest revenue producer. ADC became a distributor for U-Line in approximately 1974 because ADC desired to sell the premier line of under-the-counter ice making and refrigeration units to its customers, many of which supplied designers of high-end residential kitchens and kitchen remodels.

35.     On June 30, 1989, Ethan O'Brien formed Faxon, which then was a plumbing supplies distribution business. O'Brien's three sons, Michael O'Brien, Mark O'Brien and Sean O'Brien, owned and still own Faxon.

36.     In approximately 1991, Ethan O'Brien dissolved ADC and moved the U-Line account to Faxon, where it remained until 2016. Faxon has continued as a family-owned and operated distributor of kitchen and bath supplies to kitchen and bath dealers, plumbing supply houses, lumberyards, appliance dealers and countertop fabricators.

37.     Faxon currently distributes its kitchen and bath supplies to customers in Maine, Vermont, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, and eastern Pennsylvania.

38.     Faxon purchases its kitchen and bath supplies directly from manufacturers and stores a vast inventory of such kitchen and bath supplies in its 50,000 square foot warehouse. Faxon utilizes five trucks to make daily deliveries to its customers.

39.     U-Line granted ADC and then Faxon an exclusive territory in the states of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, and Rhode Island, and 52 counties in

New York (the "Distributor's Area"). U-Line generally authorized ADC and then Faxon to sell U-Line's full line of products, which now include under-the-counter labeled built-in Wine Captain® wine storage models, beverage centers, ice makers/machines, glass door refrigerators, solid door refrigerators, freezers, and Combo® in icemaker/refrigerator and refrigerator freezer models.

40.     During its time as a distributor for U-Line, Faxon worked closely with U-Line to develop a marketing plan. In doing so, U-Line insisted that Faxon assist its customers in setting up U-Line displays and providing U-Line literature and training. To accomplish this, U-Line required Faxon to send five to six of its employees to U-Line's facility in Wisconsin to receive annual training.

41.     U-Line also insisted that, as a condition of Faxon selling U-Line products to retail dealers, Faxon had to ensure that the retail dealers would not advertise any U-Line products as prices less than the minimum advertised price ("MAP"). If a Faxon retail-dealer customer advertised a U-Line product or products below that price, U-Line would no longer authorize Faxon to sell U-Line products to that retail dealer.

42.     U-Line also required Faxon to maintain what often was greater than necessary levels of U-Line products within Faxon's inventory.

43.     U-Line also had the contractual authority to review Faxon's financial records, and typically did so.

44.     Despite these many requirements, Faxon was willing to remain a distributor for U-Line products because U-Line had no serious competitors in the marketplace. Not only had U-Line's products rightfully earned the reputation of being the best and most innovative in the

marketplace, U-Line had earned the reputation of being the leading innovator of these high-end under-the-counter kitchen products.

45.     Faxon had signed many written agreements with U-Line over the years, including most recently in 2014 (the "Distributor Agreement"). The Distributor Agreement is attached as **Exhibit 1**.

46.     Notably, the Distributor Agreement restricted Faxon to selling U-Line products only in the Distributor's Area. The Distributor Agreement also required Faxon to "have at all times a manager approved by U-Line who shall manage Distributor's business and vigorously promote and sell the Products in accordance with this Agreement." (Exh. 1 at § 2(a).)

47.      The Distributor Agreement required Faxon to "use its best efforts to aggressively promote the full line of Products in order to meet or exceed the sales quota set forth in Schedule III of this Agreement." (Exh. 1 at § 3(b).)

48.     The Distributor Agreement required Faxon to "submit a comprehensive marketing plan to U-Line … and … use its best efforts to comply fully with the marketing plan." (Exh. 1 at § 3(b).)

49.     The Distributor Agreement required Faxon to use efforts that "shall meet or exceed those devoted to any other line of products represented by Distributor," and to, at a minimum, develop "sales and marketing programs for the Customers to promote and sell the full line of Products; assist Customers in displaying the Products, including identifying display targets and requirements;" and to conduct "sales calls to Customers on a regular basis, including in-person visits to each Customer at least once every sixty (60) days;" to host "open houses and local tradeshows for the purpose of demonstrating the Products to Distributor's sales staff and Customers;" and to establish "sales training programs, schedules, and facilities for such

9

programs, sufficient to achieve the sales quotas set forth in Schedule III of this Agreement, and to provide U-Line with consistent feed-back on the market conditions in Distributor's Territory." (Exh. 1 at § 3(b).)

50.     The Distributor Agreement also required Faxon to work with U-Line to "adjust the marketing plan from time-to-time, to the changing market conditions." (Exh. 1 at § 3(b).)

51.     The Distributor Agreement required Faxon to, "at its expense, submit to U-Line a financial statement for its preceding calendar or fiscal year, including both a profit and loss statement and a balance sheet, all prepared in accordance with generally accepted accounting principals (sic)". (Exh. 1 at § 3(c).)

52.     The Distributor Agreement obligated Faxon to "maintain a balanced inventory at a level prescribed from time to time by U-Line for the full line of Products." (Exh. 1 at § 3(d).)

53.     The Distributor Agreement granted Faxon "a nonexclusive, non-assignable, non-licensable privilege to use the U-Line trade designations only in a lawful manner and in connection with the distribution, advertising, display and sale of the Products." (Exh. 1 at § 10(a).)

54.     The Distributor Agreement also precluded Faxon from selling within the Distributor's Territory "products that compete with, or are intended to compete with, directly or indirectly, the Products that are the subject of this Agreement." (Exh. 1 at § 11.)

55.     During its years of distributing U-Line products, Faxon and its customers came to depend on their availability. As a result, Faxon's annual sales of U-Line products and services grew to $3 million in 2015, which, at 40% of Faxon's total sales, represented the most of any single product line in Faxon's portfolio.

56.     As outlined in the Distributor Agreement, U-Line required Faxon to spend tens of thousands of dollars on product displays for dealers, advertisements, salesmen incentive programs, and trade shows, and to retain an inventory of U-Line products in excess of $1 million, which was greater than Faxon needed or wanted for annual sales of $3 million. But Faxon continued to distribute U-Line products in the Distributor's Territory because they were unique and much desired product s in the high-end residential kitchen marketplace.

57.     During the entire time that Faxon was a distributor for U-Line products in its territory, U-Line never directly sold U-Line products to customers located in Faxon's territory, nor did U-Line authorize any other distributors to sell U-Line products to customers located in Faxon's territory.

### *Middleby directs U-Line to terminate Faxon.*

58.     Unbeknownst to Faxon at the time of Middleby's acquisition of U-Line in 2014, Middleby, on information and belief, planned to significantly reduce U-Line's distributorship network by terminating long-standing dealers such as Faxon without cause.

59.     The ax finally fell on Faxon, without any warning, on May 30, 2016, when Rick Kwiatkowski, U-Line's vice president for sales and customer care, sent Ethan O'Brien a letter in which Kwiatkowski wrote: "Please be advised that as of June 25, 2016 any and all relationships between U-Line Corporation ('U-Line') and Faxon Sales ('Faxon') shall terminate. This includes, but is not limited to, the parties' relationship as set forth in their Distributor Agreements." A copy of that letter is attached as **Exhibit 2**.

60.     On June 7, 2016, Sean O'Brien of Faxon sent an email to Kwiatkowski asking "Will U-Line purchase Faxon's inventory as of June 26," and "If no, it is my recollection that

11

MAP [Minimum Advertised Price] prices do not apply to non-current, discontinued, scratch and dent, unboxed, etc. stock.  Is this correct?"

61.     Kwiatkowski sent an email later that day in which he wrote: "we will not be purchasing Faxon's inventory. Your recollection of MAP is correct." A copy of that email exchange is attached as **Exhibit 3**.

62.     The loss of U-Line's product line has devastated Faxon. The loss of nearly 40% of its revenue forced Faxon to eliminate two employees and to severely reduce the salaries of many others. Making matters worse, Faxon is unable to replace this irreplaceable product line. U-Line's product offerings are unique in the marketplace, and even if Faxon could secure a distributorship for a similar line of products (and Faxon cannot), this "replacement" line would not replace the specialized niche that U-Line serves. Making matters worse, Middleby, the owner of U-Line, also owns Marvel, which is the closest competitor to U-Line. This means Marvel is not available to Faxon, either.

63.     As a result of this unlawful without-cause termination, Faxon's profits have plummeted and Faxon has had to significantly change its business model in an effort to survive.

## COUNT I
## Violation of the Connecticut Franchise Act

Faxon realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

64.     The relationship between U-Line and Faxon is subject to the Connecticut Franchise Act, Conn. Gen. Stat. Ann. §§ 42-133e, *et seq.* ("CFA").

65.     The CFA, Conn. Gen. Stat. Ann. § 42-133e(b), defines a "franchise" as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or

system prescribed in substantial part by a franchisor . . . ; and (2) the operation of the franchisee's business pursuant to such plan or system is <u>substantially associated</u> with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, <u>and includes any agreement between a manufacturer,</u> refiner or producer <u>and a distributor</u>, wholesaler or jobber, and a retailer …"  (Emphasis added).

66.    Faxon was granted a "franchise" within the meaning of the CFA.

67.    By the terms of the Distributor Agreement, Faxon was granted the right, by U-Line, to engage in the business of offering, selling or distributing U-Line products in the State of Connecticut.

68.    U-Line, furthermore, by virtue of the Distributor Agreement, required Faxon to create a marketing plan to be submitted to and approved by U-Line  for purposes of dictating Faxon's operations and sales of U-Line products, and Faxon was required to use its "best efforts to comply fully" with such plan.  (Ex. 1, § 3(b)).

69.    In fact, pursuant to the Distributor Agreement, U-Line exerted control over almost every facet of Faxon's operations, as noted, *supra*, including approving Faxon's manager (Ex. 1, § 2(a)) and requiring Faxon to:

- use efforts to sell U-Line products that meet or exceed those devoted to any other line of products sold by Faxon (Ex. 1, § 3(b));

- develop sales and marketing programs for customers (Ex. 1, § 3(b));

- assist customers in displaying the products (Ex. 1, § 3(b));

- conduct sales calls to customers on a regular basis, including in-person visits to each customer at least once every 60 days (Ex. 1, § 3(b));

- host open houses and local tradeshows (Ex. 1, § 3(b));

- establish sales training programs and schedules and facilities for such programs (Ex. 1, § 3(b));

13

- provide U-Line with consistent feed-back on the market conditions in Faxon's Territory (Ex. 1, § 3(b));

- adjust the marketing plan from time-to-time (Ex. 1, § 3(b));

- submit financial statements to U-Line each calendar year, or, more frequently, as required by U-Line in U-Line's discretion (Ex. 1, § 3(c));

- maintain inventory levels prescribed by U-Line (Ex. 1, § 3(d));

- preserve and enhance the high quality image, reputation, and goodwill of U-Line products (Ex. 1, § 3(e));

- maintain complete and accurate records of sales, inventory, orders, and deliveries from U-Line and grant U-Line access to of the same (Ex. 1, § 3(f));

- assist in the compliance with U-Line's warranty programs, any recalls by U-Line, and any other servicing of the products as requested by U-Line (Ex. 1, § 3(g));

- comply with all other requirements U-Line imposed from time to time for the effective marketing or servicing of products (Ex. 1, § 3(i)); and

- refrain from manufacturing or selling competitive products in Faxon's territory during the term of the Agreement (Ex. 1, § 11).

70. Indeed, U-Line worked closely with Faxon to develop the marketing plan, insisting that Faxon assist customers in setting up U-Line displays, and providing Faxon with U-Line literature and training.

71. U-Line also required Faxon to send its employees to U-Line's headquarters in Wisconsin for annual training.

72. U-Line also essentially controlled the prices for U-Line products sold by Faxon to Faxon's own customers.

73. Furthermore, Faxon's business operations were substantially associated with U-Line's goods, trademark, service mark, trade name, logotype, advertising or other commercial symbol.

14

74.     Pursuant to the Distributor Agreement, U-Line required Faxon to: (1) develop sales and marketing programs for customers to promote and sell the full line of products (Ex. 1, § 3(b)); (2) assist Customers in displaying the products, including identifying display targets and requirements (Ex. 1, § 3(b)); (3) host open houses and local tradeshows for the purposes of demonstrating the products to Faxon's sales staff and customers (Ex. 1, § 3(b)); and (4) preserve and enhance the high quality image, reputation and goodwill of U-Line products (Ex. 1, § 3(e)).

75.     U-Line also granted Faxon "<u>a nonexclusive, non-assignable, non-licensable privilege to use the U-Line trade designations</u> only in a lawful manner and in connection with the distribution, advertising, display and sale of the Products." (Ex. 1 at § 10(a) (emphasis added).

76.     During its years of distributing U-Line products, Faxon and its customers came to depend on their availability, and Faxon's annual sales of U-Line products and services reached $3 million in 2015, or 40% of Faxon's total sales, more than any single product line in Faxon's portfolio.

77.     Faxon also spent tens of thousands of dollars on U-Line product displays for dealers, advertisements, salesmen incentive programs, and trade shows, and Faxon retained an inventory of U-Line products in excess of $1 million.

78.     U-Line also never directly sold U-Line products to customers located in Faxon's territory and never authorized any other distributors to sell U-Line products to customers located in Faxon's territory.

79.     The CFA, Conn. Gen. Stat. Ann. § 42-133e(c), defines a "franchisor" as "a person who grants a franchise to another person, including a manufacturer, refiner or producer or a distributor, wholesaler or jobber who grants to a distributor, wholesaler or jobber or retailer, as

the case may be, the authority to use a trademark, tradename, service mark or other identifying symbol or name under a franchise … ."

80.     The CFA, Conn. Gen. Stat. § 42-133e(d), defines a "franchisee" as "a person to whom a franchise is granted, including a distributor, wholesaler or jobber or retailer who is granted the authority under a franchise to use a trademark, tradename, service mark or other identifying symbol or name."

81.     In view of the foregoing, Faxon was, until its unlawful termination by U-Line, properly characterized as a "franchisee" and U-Line was a "franchisor" within the meaning of CFA.

82.     The CFA, Conn. Gen. Stat. § 42-133f(a), expressly provides that: "No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement or for the reasons stated in subsection (e) of this section. The franchisor shall give the franchisee written notice of such termination … at least sixty days in advance to such termination … with the cause stated thereon ..."

83.     U-Line violated the CFA, Conn. Gen. Stat. § 42-133f(a), by terminating the Distributor Agreement in the absence of good cause, written notice, and an opportunity to cure any observed breaches of the Distributor Agreement by Faxon.

84.     U-Line's violations of the CFA proximately caused, and continue to proximately cause, Faxon to suffer ascertainable damages (i.e., the profits Faxon would have received from its operations had U-Line not unlawfully terminated the Distributor Agreement, which means the actual lost value of the Distributor Agreement).

16

85.     As a result, Faxon is entitled "to recover damages sustained by reason of such violation[s]" of the CFA by U-Line, as well as Faxon's "costs, including, but not limited to, reasonable attorneys' fees." *See* Conn. Gen. Stat. § 42-133g(a).

86.     Notably, Faxon's statutory rights under the CFA are not subject to contractual waiver.

87.     "Any waiver of the rights of a franchisee under sections 42-133f or 42-133g which is contained in any franchise agreement entered into or amended on or after June 12, 1975, shall be void." *See* Conn. Gen Stat. § 42-133f(f).

88.     As such, U-Line cannot require Faxon to waive its statutory claims under the CFA.

89.     Faxon is entitled to recover its damages, including costs, interest, and attorneys' fees, which are reasonably believed to be well in excess of $75,000.

## COUNT II
## Violation of the Connecticut Unfair Trade Practices Act

Faxon realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

90.     The relationship between U-Line and Faxon is subject to the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA").

91.     The CUTPA defines a "person" as "a natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, and any other legal entity." Conn. Gen. Stat. § 42-110a(3).

92.     The CUTPA defines "trade" and "commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a(4).

17

93.     U-Line qualifies as a "person" engaged in "trade" and "commerce" because U-Line is a corporation and, by the terms of the Distributor Agreement, Faxon was granted the right, by U-Line, to engage in the business of offering, selling or distributing U-Line products in the State of Connecticut.

94.     CUPTA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

95.     In determining whether a practice violates CUTPA, courts have used the "cigarette rule" adopted by the Federal Trade Commission, which looks to: whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons. *See Bentley v. Greensky Trade Credit, LLC*, 156 F. Supp. 3d 274, 288–89 (D. Conn. 2015), *reconsideration denied sub nom. Bentley v. Tri-State of Branford, LLC*, No. 3:14-CV-1157 (VAB), 2016 WL 2626805 (D. Conn. May 6, 2016).

96.     U-Line's above-mentioned conduct meets the "cigarette rule" standard and qualifies as "unfair or deceptive acts or practices."

97.     More specifically, U-Line's termination caused Faxon to lose approximately $3 million in annual revenue, which represents 40% of Faxon's total sales.

98.     Making matters worse for Faxon, U-Line refused to purchase Faxon's inventory and left Faxon stranded with items that it could ultimately not sell to its customers.

18

99. Faxon is completely out of the niche market that formerly accounted for 40% of its sales. Faxon cannot adequately replace U-Line's unique product line and Faxon is now left with no substitute for its former number one product line. Indeed, Middleby, the owner of U-Line, also owns Marvel, which is U-Line's top competitor. As a result, Marvel products are also unavailable to Faxon.

100. Faxon has been forced to eliminate employees and significantly change its business model in an effort to merely survive. At this time, Faxon cannot even determine if it will be able to sustain operations and remain in business without the U-Line product line.

101. U-Line's CFA violation, Count I, *supra*, also constitutes a violation of CUPTA. *See Charts v. Nationwide Mut. Ins. Co.*, 397 F. Supp. 2d 357, 372 (D. Conn. 2005), *rev'd sub nom. on other grounds by Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116 (2d Cir. 2008) (finding that the conduct underlying the CFA count provided the jury with a basis for finding that Nationwide also violated CUTPA).

102. Moreover, U-Line's conduct will cause substantial injury to similarly situated dealers, like Faxon, who are terminated without cause, as well as consumers at large (including Faxon's customers [retailers]) who also depend on the availability and reliability of Faxon's offering of U-Line products.

103. U-Line's violations of CUTPA proximately caused, and continue to proximately cause, Faxon to suffer ascertainable damages (i.e., the profits Faxon would have received from its operations had U-Line not unlawfully terminated the Distributor Agreement, which means the actual lost value of the Distributor Agreement).

104.    As a result, Faxon is entitled to the damages provided under Conn. Gen. Stat. § 42-110g, which includes actual damages, the recovery of costs and attorneys' fees, and punitive damages in the court's discretion, which are reasonably believed to be well in excess of $75,000.

## COUNT III
## Violation of the Rhode Island Fair Dealership Act

Faxon realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

105.    The relationship between U-Line and Faxon is subject to the Rhode Island Fair Dealership Act, 6 R.I. Gen. Laws §§ 60-50-1, *et seq.* ("RIFDA").

106.    RIFDA, 6 R.I. Gen. Laws § 6-50-2(3) defines a "dealership" as: "(i) A contract or agreement, either expressed or implied, whether oral or written, between two (2) or more persons, by which a person is granted the right to sell or distribute goods or services, <u>or</u> use a trade name, trademark, service mark, logotype, advertising, or other commercial symbol, in which there is a community of interest in the business of offering, selling, or distributing goods or services at wholesale, retail, by lease, agreement, or otherwise."  (Emphasis added).

107.    Faxon was granted a "dealership" within the meaning of RIFDA.

108.    By the terms of the Distributor Agreement, U-Line granted Faxon the right to engage in the business of offering, selling or distributing U-Line products across the entire State of Rhode Island.

109.    Furthermore, U-Line granted Faxon the right to use, market, and advertise to its customers the U-Line trade name, trademark, service, logotype, advertising, or commercial symbol, including in the following ways:

- Pursuant to the Distributor Agreement, U-Line required Faxon to: (1) develop sales and marketing programs for customers to promote and sell the full line of products (Ex. 1, § 3(b)); (2) assist Customers in displaying the products, including

20

identifying display targets and requirements (Ex. 1, § 3(b)); (3) host open houses and local tradeshows for the purposes of demonstrating the products to Faxon's sales staff and customers (Ex. 1, § 3(b)); and (4) preserve and enhance the high quality image, reputation and goodwill of U-Line products (Ex. 1, § 3(e));

- Pursuant to the Distributor Agreement, U-Line granted Faxon "<u>a nonexclusive, non-assignable, non-licensable privilege to use the U-Line trade designations</u> only in a lawful manner and in connection with the distribution, advertising, display and sale of the Products." (Ex. 1 at § 10(a) (emphasis added)); and

- Faxon spent tens of thousands of dollars on U-Line product displays for dealers, advertisements, salesmen incentive programs, and trade shows.

110. RIFDA defines a "community of interest" as "a continuing financial interest between the grantor and the grantee in either the operation of the dealership business or the marketing of such goods or services." 6 R.I. Gen. Laws § 6-50-2(1).

111. A community of interest clearly existed between U-Line and Faxon because when Faxon made sales, both U-Line and Faxon eventually profited. Indeed, U-Line's sales to Faxon were dependent upon Faxon's sales to its customers, which ultimately caused Faxon to purchase additional inventory from U-Line. In other words, if Faxon made money, U-Line made money. Such relationship easily qualifies as a "continuing financial interest" between the two with regard to Faxon's operations and the marketing of U-Line's products. U-Line's control over Faxon's marketing plan and marketing generally further demonstrates the "community of interest" between the two parties.

112. RIFDA, 6 R.I. Gen. Laws § 6-50-2(2), defines a "dealer" as "a person who is a grantee of a dealership situated in this state."

113. RIFDA, 6 R.I. Gen. Laws § 6-50-2(2), defines a "grantor" as "a person who grants a dealership."

114. In view of the foregoing, Faxon was, until its unlawful termination by U-Line, properly characterized as a "dealer" and U-Line was a "grantor" within the meaning of RIFDA.

21

115.     RIFDA, 6 R.I. Gen. Laws § 6-50-4(a), expressly provides that: " Notwithstanding the terms, provisions, or conditions of any agreement to the contrary, a grantor shall provide a dealer sixty (60) days prior, written notice of termination, cancellation, or nonrenewal.  The notice shall state all the reasons for termination, cancellation, or nonrenewal and shall provide that the dealer has thirty (30) days in which to cure any claimed deficiency; provided that a dealer has a right to cure three (3) times in any twelve-month (12) period during the period of the dealership agreement."

116.     U-Line violated RIFDA, 6 R.I. Gen. Laws § 6-50-4(a) and 6 R.I. Gen. Laws § 6-50-2(4), by terminating the Distributor Agreement in the absence of written notice, and an opportunity to cure any observed breaches of the Agreement by Faxon, and in absence of the implied "good cause" requirement.

117.     U-Line's violations of RIFDA proximately caused, and continue to proximately cause, Faxon to suffer ascertainable damages (i.e., the profits Faxon would have received from its operations had U-Line not unlawfully terminated the Distributor Agreement, which means the actual lost value of the Distributor Agreement).

118.     As a result, Faxon is entitled to recover the "damages sustained by the dealer as a consequence of the grantor's violation, together with the actual costs of the action, including reasonable, actual attorneys' fees."  6 R.I. Gen. Laws § 6-50-7.

119.     Despite its refusal, U-Line was also obligated, by virtue of its unlawful termination, to repurchase Faxon's U-Line inventory at the fair, wholesale market value. *See* 6 R.I. Gen. Laws § 6-50-5.

120.     Notably, Faxon's statutory rights under RIFDA are not subject to contractual waiver.

22

121.     "The effect of this chapter may not be varied by contract or agreement. Any contract or agreement purporting to do so is void and unenforceable to that extent only." *See* 6 R.I. Gen. Laws § 6-50-3(c).

122.     As such, U-Line cannot require Faxon to waive its statutory claims under RIFDA.

123.     Faxon is entitled to recover its damages, including costs, interest, and attorneys' fees, and the fair, wholesale market value of its U-Line inventory at the time of termination, which are reasonably believed to be well in excess of $75,000.

### COUNT IV
### Violation of the New York Unfair Trade Practices Act

Faxon realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

124.     The relationship between U-Line and Faxon is subject to the New York Unfair Trade Practices Act (NYUTPA), NY GBL § 349.

125.     The New York Unfair Trade Practices Act (NYUTPA), NY GBL § 349, provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

126.     U-Line, by authorizing Faxon to distribute its products in New York, is engaged in trade or commerce as provided in the NYUTPA.

127.     U-Line is engaged in "trade" and "commerce" because by the terms of the Distributor Agreement, Faxon was granted the right, by U-Line, to engage in the business of offering, selling or distributing U-Line products in the State of New York.

128.     U-Line's conduct violating the NYUTPA is detailed in the factual background, and, further, at Paragraphs 96–100, 102, *supra*.

23

129.    The foregoing deceptive and unfair acts and practices by U-Line were directed at consumers and were consumer oriented because such conduct will cause substantial injury to similarly situated dealers, like Faxon, who are terminated without cause, as well as consumers at large (including Faxon's customers (retailers) who also depend on the availability and reliability of Faxon's offering of U-Line products.

130.    U-Line's violations of NY GBL § 349 proximately caused, and continue to proximately cause, Faxon to suffer ascertainable damages (i.e., the profits Faxon would have received from its operations had U-Line not unlawfully terminated the Distributor Agreement, which means the actual lost value of the Distributor Agreement).

131.    As a result, Faxon is entitled to the damages provided under NY GBL § 349(h), which includes actual damages, the recovery of costs and attorneys' fees, and punitive damages in the court's discretion, which are reasonably believed to be well in excess of $75,000.

**COUNT V**
**Violation of the Massachusetts Consumer Protection Act**

Faxon realleges and incorporates by reference all of the allegations as though fully set forth herein.

132.    The relationship between U-Line and Faxon is subject to the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 1, *et seq.* (MCPA).

133.    The MCPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws ch. 93A, § 2(a)

134.    The MCPA defines a "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Mass. Gen. Laws ch. 93A, § 1(a).

135.     The MCPA defines "trade" and "commerce" as "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." Mass. Gen. Laws ch. 93A, § 1(b).

136.     U-Line qualifies as a "person" engaged in "trade" and "commerce" because U-Line is a corporation and, by the terms of the Distributor Agreement, Faxon was granted the right, by U-Line, to engage in the business of offering, selling or distributing U-Line products in the Commonwealth of Massachusetts.

137.     In determining whether a practice violates MCPA, courts have used the "cigarette rule" adopted by the Federal Trade Commission, similar to Count II, *supra*. *See* https://1.next.westlaw.com/Link/Document/FullText?findType=Y&serNum=2024286053&pubNum=0004637&originatingDoc=ND8DCF430173B11DB9292C066B0348FB7&refType=RP&originationContext=notesOfDecisions&contextData=%28sc.Category%29&transitionType=NotesOfDecisionItem*Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 123 (D. Mass. 2010).

138.     U-Line's above-mentioned conduct, as detailed in the factual background, and, further, at Paragraphs 96–100, 102, *supra*, meets the "cigarette rule" standard and qualifies as "unfair or deceptive acts or practices."

139.     Furthermore, the foregoing deceptive and unfair acts and practices by U-Line were directed at consumers and were consumer oriented because such conduct will cause

substantial injury to similarly situated dealers, like Faxon, who are terminated without cause, as well as consumers at large (including Faxon's customers (retailers) who also depend on the availability and reliability of Faxon's offering of U-Line products.

140. U-Line's violations of the MCPA proximately caused, and continue to proximately cause, Faxon to suffer ascertainable damages (i.e., the profits Faxon would have received from its operations had U-Line not unlawfully terminated the Distributor Agreement, which means the actual lost value of the Distributor Agreement).

141. As a result, Faxon is entitled to the damages provided under the MCPA Mass. Gen. Laws ch. 93A, § 9, which includes actual damages, the recovery of costs and attorneys' fees, and punitive damages in the court's discretion, which are reasonably believed to be well in excess of $75,000.

## COUNT VI
### Violation of New Hampshire Consumer Protection Act

Faxon realleges and incorporates by reference all of the allegations as though fully set forth herein.

142. The relationship between U-Line and Faxon is subject to the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* ("NHCPA").

143. The NHCPA provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2.

144. The NHCPA defines a "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." N.H. Rev. Stat. § 358-A:1(I).

26

145.    The NHCPA defines "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."  N.H. Rev. Stat. § 358-A:1(II).

146.    U-Line qualifies as a "person" engaged in "trade" and "commerce" because U-Line is a corporation and, by the terms of the Distributor Agreement, Faxon was granted the right, by U-Line, to engage in the business of offering, selling or distributing U-Line products in State of New Hampshire.

147.    Unfair conduct that runs afoul with the NHCPA "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  *Hobin v. Coldwell Banker Residential Affiliates, Inc.*, 744 A.2d 1134, 1141 (N.H. 2000).

148.    U-Line's above-mentioned conduct, as detailed in the factual background, and, further, at Paragraphs 96–100, 102, *supra*,  "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."

149.    Furthermore, the foregoing deceptive and unfair acts and practices by U-Line were directed at consumers and were consumer oriented because such conduct will cause substantial injury to similarly situated dealers, like Faxon, who are terminated without cause, as well as consumers at large (including Faxon's customers (retailers) who also depend on the availability and reliability of Faxon's offering of U-Line products.

150.    U-Line's violations of the MHCPA proximately caused, and continue to proximately cause, Faxon to suffer ascertainable damages (i.e., the profits Faxon would have

received from its operations had U-Line not unlawfully terminated the Distributor Agreement, which means the actual lost value of the Distributor Agreement).

151.    As a result, Faxon is entitled to the damages provided under N.H. Rev. Stat. § 358-A:10, which includes actual damages, the recovery of costs and attorneys' fees, and punitive damages in the court's discretion, which are reasonably believed to be well in excess of $75,000.

## V.  JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and counterclaims made in this matter.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, Faxon respectfully requests that the Court grant the following relief:

1.    A judgment that U-Line's termination of the Distributor Agreement violated the CFA.

2.    A judgment that U-Line's termination of the Distributor Agreement violated the CUTPA.

3.    A judgment that U-Line's termination of the Distributor Agreement violated the RIFDA.

4.    A judgment that U-Line's termination of the Distributor Agreement violated the MCPA.

5.    A judgment that U-Line's termination of the Distributor Agreement violated the NHCPA.

6.    A judgment in the amount of the lost profits that Faxon has suffered as a result of U-Line's unlawful  termination of the Distributor Agreement.

7.    A judgment for the costs and reasonable attorneys' fees spent by Faxon in prosecuting this case.

8.    A judgment granting Faxon such other and further relief as this Court deems just and equitable.

Dated this 22nd day of June, 2017.

Respectfully submitted:

BOARDMAN & CLARK LLP

*/s/ Gary L. Antoniewicz*

By:_____
     Gary L. Antoniewicz, SB No. 1017114
1 S. Pinckney St., Ste. 410
P.O. Box 927
Madison, WI 53701-0927
PH:    608-283-1759 Direct
PH:    608-257-9521
Fax:   608-283-1709
gantoni@boardmanclark.com

and

Scott E. Korzenowski, MN 027155X
J. Michael Dady, MN 2062X
Andrew Malzahn, MN 0397571
DADY & GARDNER, P.A.
5100 IDS Center, 80 South 8th Street
Minneapolis, MN   55402
PH:    612-359-9000
FX:    612-359-3507
jhaff@dadygardner.com
sekorzenowski@dadygardner.com

***Attorneys for Plaintiff***